# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 2, 2001

## STATE OF TENNESSEE v. LAKEISHA JONES

### Appeal from the Circuit Court for Haywood County
### No. 4230    Mark Agee, Judge

---

### No. W2000-02962-CCA-R3-CD - January 25, 2002

---

A Haywood County Circuit Court jury convicted the defendant, Lakeisha Jones, of second degree murder, and the trial court sentenced her as a violent offender to fifteen years in the Tennessee Department of Correction. The defendant appeals, contending that the evidence is insufficient to support her conviction and that the trial court failed to instruct the jury as to mutual combat. We affirm the judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ROBERT W. WEDEMEYER, J., joined.

Clifford K. McGown, Jr., Waverly, Tennessee (on appeal); Tom W. Crider, District Public Defender, and J. Diane Stoots, Assistant Public Defender, Trenton, Tennessee (on appeal); and Ramsdale O'DeNeal, Jr., Jackson, Tennessee (at trial), for the appellant, Lakeisha Jones.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; Hal Dorsey, Assistant District Attorney General; Ted Neumann, Assistant District Attorney General; and Guy Townsend, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case arises from the stabbing death of Travis Harris. Jason Raines, a former patrolman with the Brownsville Police Department, testified that on February 19, 1999, he was called to Haywood Park Hospital to help another police officer with a stabbing victim. When Mr. Raines arrived at the hospital about 9:45 p.m., the victim was in the trauma room. The emergency room nurse told Mr. Raines that the victim's name was Travis Harris, the victim had been stabbed close to the heart, and the outlook for the victim's survival was poor. After hearing this, Mr. Raines called Sergeant Shawn Williams to the hospital. About seven people were at the hospital with the victim, and Mr. Raines talked to some of them. The victim was pronounced dead about 11:00 p.m.

After the victim's death, Mr. Raines and Sergeant Williams went to the trailer where the victim had been stabbed. In the trailer, they found two bloody steak knives. They also saw blood on a chair, on carpet beneath the chair, and on curtains. Sergeant Williams collected the two knives and took pictures of the residence. On cross-examination, Mr. Raines testified that he and Sergeant Williams found the knives on the kitchen table and that the two knives appeared to be from the same set. He did not recall seeing alcoholic beverages in the trailer, and he and Sergeant Williams were in the trailer about fifteen minutes.

Sergeant Shawn Williams of the Brownsville Police Department testified that Officer Raines called him to the hospital for assistance with a stabbing victim. Sergeant Williams took photographs of the victim and talked with the defendant, who was at the hospital with the victim.

Sergeant Williams testified that the defendant gave him the following account of what happened: The defendant had been trying to find the victim earlier that day in order to get her house key from him. The defendant was going out of town that weekend and had heard that the victim was going to have another girl at their house while she was gone. A friend telephoned the defendant and told her that the victim was with a girl at 413 Carver Street. The defendant got a knife from the kitchen, put it in her pocket, and asked her uncle to take her to the Carver Street residence. The defendant went into the residence and saw the victim sitting at a table with another girl. The defendant walked up to the victim and asked him "if that's what he was planning on doing while she was out of town." The victim told the defendant to "go on" and they began to argue. The victim stood up and grabbed the defendant. As the victim grabbed her, the defendant pulled the knife out of her pocket. The victim pushed the defendant down into a chair and started hitting her. The victim stood up and said to the defendant, "[Y]ou stabbed me, bitch." The victim then kicked or punched the defendant in the head. Some other people carried the victim out of the residence and took him to the hospital. The defendant remembered having the knife in her hand, but she did not know if she stabbed the victim.

Sergeant Williams had the defendant sign a Waiver of Rights form. He wrote down what the defendant told him, had the defendant review her statement, and had the defendant sign it. The defendant told Sergeant Williams that there had been a history of domestic violence between her and the victim. According to her written statement, the defendant confronted the victim on almost a daily basis about the victim's involvement with other women.

On cross-examination, Sergeant Williams testified that the defendant was cooperative and willing to give a statement and that the defendant seemed concerned about the victim. He said that the two steak knives they found in the trailer appeared to be from the same set. Sergeant Williams did not know which knife killed the victim, and he did not test the knives for fingerprints. He also did not see evidence that alcoholic beverages were being consumed in the trailer at the time of the stabbing.

Keisha Nixon testified that on the evening of February 19, 1999, she, the victim, Tekelia Smith, and several other people were playing cards around the kitchen table in Ms. Nixon's trailer at 413 Carver Street. She said that she and the victim were sitting beside each other. She said that

the defendant, who had not been present, entered the trailer and walked over to the victim. She said that the defendant said to the victim "so this is what you will be doing when I'm out of town." She said that at first, the victim was smiling and that he told the defendant to go home. She said that the victim and the defendant argued and that the defendant pulled out two knives. She said that the victim grabbed the defendant's wrists and that they began to wrestle. Ms. Nixon said that she saw the defendant and the victim fall into a chair and that they were hitting each other. She said that she then saw the victim stand up. She said that she looked away and that when she looked back again, the victim had fallen onto the floor. She said that she did not see any blood but that Tekelia Smith picked the victim up and said he was bleeding. She said that the victim put his hand to his chest, ran toward the door, and fell. She said that they took the victim to the hospital. She said that after the stabbing, she saw two knives lying on the kitchen table.

Tekelia Smith, the victim's girlfriend, testified that she, the victim, and several other people were playing cards around the kitchen table in Ms. Nixon's trailer. Ms. Smith was sitting beside the victim. The defendant arrived and asked the victim if this was what he was going to do when she left for the weekend. The victim replied to the defendant that he did not "want to hear it no more." The defendant walked to the other end of the table and then walked back to the victim. The victim told the defendant that she "better not." When Ms. Smith turned around, she saw the victim and the defendant in a chair, and the victim was on top of the defendant. Ms. Smith pulled the victim off the defendant. Ms. Smith did not see any knives.

Lamanda Wilson testified that she was at Keisha Nixon's house on February 19. She said that the defendant came into the trailer and walked over to the victim, who was sitting at the kitchen table. She said that the defendant said, "[S]o this is what you would have been doing if I would have went out of town." She said that she got her coat and went outside. She said that a short time later, she heard yelling and that she went back inside the trailer. She said that the victim had been stabbed and that the defendant was holding bloody knives. She said that she took the knives away from the defendant and that she put the knives on the kitchen table. On cross-examination, Ms. Wilson said that she did not see the defendant and the victim struggle or the defendant stab the victim.

Jenelle Cooper testified that she was sitting at the kitchen table in Keisha Nixon's trailer when the defendant came in and asked the victim if this was what he was going to do while the defendant was in St. Louis. Ms. Cooper said she did not hear the victim say anything to the defendant. She said that the defendant seemed mad and that the defendant pulled some knives out of her pocket. She said that the defendant was holding a knife in each hand and that she saw the victim push the defendant onto the couch.

Dr. Cynthia Gardner, Assistant Medical Examiner for Shelby County, performed an autopsy on the victim and concluded that the victim died from a knife wound to his heart. She also found two nonfatal cuts on the victim's body: one to the left forearm and one to the left forehead. Dr. Gardner said that the victim weighed one hundred and twenty pounds and was five feet five inches tall. She acknowledged that she could not determine whether the victim fell on the knife or the defendant stabbed the victim.

The defendant testified that she had three children, all fathered by the victim, and that she was three months pregnant with their third child at the time of the incident in question. She said that she and the victim were engaged and that on February 19, 1999, she was planning to go to St. Louis for the weekend. She said that her mother told her that the victim had been seen picking up a female at school. The defendant said that she called the victim and asked him about it but that the victim denied picking up the girl. She said that later that night, she went home to pack her clothes for the St. Louis trip. She said that she went to her uncle's house and telephoned her cousin. She said that she talked to her cousin's daughter, Adrian Taylor, and that Ms. Taylor told her that the victim had in fact picked up a female at school. She said that Ms. Taylor told her that the victim was at Keisha Nixon's trailer. She said that Ms. Taylor asked her what she was going to do and that she replied, "[N]othing. I am just going to wait until he comes to the house."

The defendant testified that she went home and thought about the situation. She said that she went back to her uncle's house and asked him to take her to Keisha Nixon's trailer. She said that she took one knife from her home. She said that she took the knife with her because she had caught the victim with Tekelia Smith before and that she did not want Ms. Smith to "jump" her.

The defendant testified that someone opened the door to the trailer and that she walked inside. She said that the victim and Tekelia Smith were sitting at the kitchen table playing cards. She said that she asked the victim if "this [was] what he was gonna be doing while I was out of town." She said that the victim told her to "go on" and that she walked around to the other side of the kitchen table. She said that she had the knife in her right pocket. She said that even though she did not pull the knife out of her pocket, the victim may have seen it. She said that the victim jumped up and that he grabbed both of her wrists. She said that they struggled into a chair and that the victim started hitting her. She said that they struggled for three to four minutes. She said that she "went black" and that when she came to, the victim stood up and said, "[Y]ou stabbed me, bitch." She said that as soon as the victim made that statement, he "came back on" her. She said that he got off of her and that he held his chest. She said that she looked around and saw the victim lying by the door. She said that she did not see any blood until Lamanda Wilson took the knife out of her hand.

The defendant said that she did not intend to hurt anyone, that she did not want to kill the victim, and that she did not plan for this to happen. She said that she was angry and hurt by the victim's cheating on her. She said that she knew that the victim would come home eventually but that she just wanted to let the victim know that she knew he was seeing someone else. She said that she loved the victim.

On cross-examination, the defendant acknowledged that sometime before this incident, she broke out the back window of the victim's car with a brick because she had paged the victim and a female called back. She said that she did not see two knives the night the victim died. She said that she could not call the victim at Keisha Nixon's trailer because Ms. Nixon did not have a telephone.

Wilbert Atkins, the pastor of Mercer Baptist Church, testified that the defendant was a member of the church and that he knew her for about five years. The defendant brought her children

to church. Mr. Atkins had never known the defendant to be violent and had never heard anything negative about her. When asked on cross-examination if he had heard about the defendant breaking out the victim's car window, he said that he had not heard about it.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support her conviction for second degree murder. In support of her argument, she cites Wilson v. State, 574 S.W.2d 52 (Tenn. Crim. App. 1978), in which this court stated that the absence of malice at the time of the killing shows that a defendant is guilty of voluntary manslaughter, not second degree murder. The state contends that the evidence is sufficient to support the second degree murder conviction. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. Tenn. Code Ann. § 39-13-210(a)(1).

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b).

Although the defendant refers to Wilson and argues that the absence of malice at the time of the killing precludes a second degree murder conviction, the revision of Tennessee's criminal code in 1989 eliminated "malice aforethought" as an element of second degree murder. Therefore, "it is now inaccurate to state that the element of malice is the essential distinction between second degree murder and manslaughter." State v. Williams, 38 S.W.3d 532, 538 (Tenn. 2001). Instead, "the essential element that now distinguishes these two offenses (which are both 'knowing' killings) is whether the killing was committed 'in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'" Id. (quoting Tenn. Code Ann. § 39-13-211(a)). "Whether the acts constitute a 'knowing killing' (second degree murder) or a killing

due to 'adequate provocation' (voluntary manslaughter) is a question for the jury." State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

Viewed in the light most favorable to the state, the evidence shows that the defendant unlawfully and knowingly killed the victim. The defendant testified that after she talked with Adrian Taylor, Ms. Taylor asked the defendant what she was going to do, and the defendant replied, "Nothing." The defendant then testified that she thought about the situation and decided to go to the trailer at 413 Carver Street. She took two knives with her and hid them in her pocket. At the trailer, the angry defendant confronted the victim. After the victim told the defendant to go away, the defendant pulled out the knives. The evidence shows that the victim saw the knives, grabbed the defendant's wrists, and struggled with the defendant. During the struggle, the defendant cut the victim's forehead and forearm and stabbed him in the chest. Although the defendant testified that she took the knives to the trailer with no intention of killing the victim and that the stabbing was an accident, a rational jury could have found that the victim was defending himself and concluded beyond a reasonable doubt that the defendant was aware that her conduct was reasonably certain to cause the victim's death. Although the trial court instructed the jury as to voluntary manslaughter, the jury believed that the defendant knowingly killed the victim without passion based upon adequate provocation. We believe that the evidence is sufficient to support the conviction.

## II. MUTUAL COMBAT INSTRUCTION

Next, the defendant contends that the trial court should have instructed the jury on mutual combat. The state argues that the defendant has waived this issue because the defendant failed to support her argument. In addition, the state contends that such a charge was not warranted because the concept of mutual combat has been incorporated into the elements of voluntary manslaughter. We believe that the trial court did not err in failing to give a mutual combat instruction.

Initially, we note that the defendant failed to object to the charge at trial, did not request a special instruction on mutual combat at trial, and did not raise the issue in her motion for new trial. "As a general rule, no assignment of error based upon omission or inadequacy of the judge's instructions to the jury will be considered unless a special request was tendered, pointing out the appellant's contention as to the error." State v. Reece, 637 S.W.2d 858, 861 (Tenn. 1982) (citing Crawford v. State, 197 Tenn. 411, 273 S.W.2d 689, 693 (1954)). Furthermore, a defendant seeking to challenge the jury instructions given at trial must raise the issue in her motion for new trial or it will be waived. T.R.A.P. 3(e). However, the trial court has a duty to charge the jury on all of the law that applies to the facts of the case. State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies a defendant his constitutional right to trial by a jury. State v. McAfee, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). Because the failure to give the jury a complete charge would affect the substantial rights belonging to the defendant, we review her contention regarding a mutual combat instruction for plain error. See Tenn. R. Crim. P. 52(b).

In State v. Williams, our supreme court held that the 1989 revised criminal code abrogated the mutual combat doctrine. 38 S.W.3d 532, 539 (Tenn. 2001). The supreme court also stated that the essence of the doctrine was incorporated into the provocation element of the voluntary

manslaughter statute and noted that although the revised criminal code abrogated the doctrine, a defendant still could use proof of mutual combat to show a jury that adequate provocation warranted a voluntary manslaughter conviction. Id. In this case, the trial court gave the jury the pattern voluntary manslaughter instruction, which informed the jury that voluntary manslaughter results from "a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." We conclude that the trial court gave the jury an adequate charge of the law and did not commit plain error in the instructions.

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE